1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RENARD BROOKS, JR.,                    No.  1:18-cv-00883-LJO-JLT (HC)

12                     Petitioner,           **FINDINGS AND RECOMMENDATION
                                             TO DENY PETITION FOR WRIT OF
13         v.                                HABEAS CORPUS**

14    MARTIN BIDER,                          **[TWENTY-ONE DAY OBJECTION
                                             DEADLINE]**
15                     Respondent.

16

17         Petitioner is currently serving a life sentence in state prison for his 2014 conviction for

18   multiple offenses involving kidnaping, robbery, burglary and carjacking. He has filed the instant

19   habeas action challenging the conviction. As discussed below, the Court finds the claims to be

20   without merit and recommends the petition be **DENIED.**

21   **I.      PROCEDURAL HISTORY**

22         On April 19, 2014, Petitioner was found guilty by jury trial in the Fresno County Superior

23   Court of kidnaping to commit robbery (Cal. Penal Code § 209(b)(1)), kidnaping in the

24   commission of a carjacking (Cal. Penal Code § 209.5(a)), first degree residential robbery (Cal.

25   Penal Code § 211), second degree robbery (Cal. Penal Code § 211), first degree residential

26   burglary (Cal. Penal Code §§ 459, 460(a)), and possession of a firearm by a felon (Cal. Penal

27   Code § 29800(a)(1)). People v. Brooks, 2016 WL 3032035, at *1 (Cal. Ct. App. 2016). The jury

28   further found true a gun use enhancement. Id. Petitioner admitted one prior strike conviction, one

                                             1

1    prior serious felony conviction, and having served prior prison terms pursuant to Cal. Penal Code

2    § 667. Id. He was sentenced to a prison term of life with the possibility of parole plus 17 years.

3    Id.

4        Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth

5    DCA"). On May 19, 2016, the judgment was affirmed. Id. Petitioner filed a petition for review in

6    the California Supreme Court, and the petition was denied on July 27, 2016. Id.

7        On May 30, 2018, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc.

8    1.) Respondent filed an answer on September 24, 2018. (Doc. 22.) Petitioner filed a traverse on

9    November 1, 2018. (Doc. 25.)

10   **II.    FACTUAL BACKGROUND**

11       The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[1]:

12       ***The Crime***

13   On October 7, 2013, [FN 2] between 7:40 a.m. and 7:45 a.m., Allison Casagrande
14   said goodbye to her husband Timothy Casagrande and left her home for work. [FN
     3.] She left without locking her front door.

15       FN 2. All dates occurred in 2013.

16       FN 3. Because Allison Casagrande and Timothy Casagrande share the same
17       last name, we refer to them by their first names. No disrespect is intended.

18   As she walked to her car, she noticed a Black male with short black hair,
     approximately six feet tall and 200 pounds, walking down the sidewalk about 60 to
19   65 feet from her home. The man, whom she later identified as defendant, was
     looking down at his phone. He was wearing dark pants, a black backpack, and a gray
20   sweatshirt. Although he appeared out of place, Allison thought he could be a high
     school student, so she proceeded to drive to work.

21   Timothy testified shortly after Allison left, he was walking toward his bedroom
     when he saw a man standing at the end of the hallway. The man, he later identified
22   as defendant, pointed a gun at him and told him to get down. Timothy briefly saw
     defendant's face before defendant hit him, knocked him to the ground, tied
23   Timothy's hands behind his back, and then blindfolded him with a shirt he pulled
     over his head. Timothy described the intruder as a Black male with short hair,
24   wearing a dark sweatshirt over a red T-shirt, blue jeans, and black and white gloves.

25   Defendant asked Timothy where his guns, money, and safe were located. Timothy
     told him he had some guns and jewelry inside of a closet in the home. After trying,
26

27   _____
     [1] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).
     Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir.
28   2009).

                                            2

unsuccessfully, to elicit the combination to the safe, defendant asked where Timothy's watch and wedding ring were.

Defendant moved Timothy into the garage and positioned him face down in the backseat of Timothy's car. He loaded the vehicle with various items from inside the home and drove away. Timothy was still in the backseat.

Defendant stopped to purchase gas using Timothy's gas card, drove to another location, and asked Timothy for his debit card and PIN (personal identification number). Defendant continued to drive around with Timothy blindfolded in the backseat. He made several more stops, during which time he removed from the car the items he took from Timothy's home. Half an hour later, defendant stopped the car, told Timothy the keys were under the seat, instructed him to count backwards from 100, and fled on foot.

Timothy freed himself from his restraints and asked a pedestrian for assistance. The pedestrian called 911 and Timothy was taken by ambulance to the hospital. He suffered a concussion, bruised ribs, and various scratches and bruises.

### *The Investigation*

Christopher Casagrande, Timothy's son, came to his parents' home after his father failed to show up for a scheduled game of golf. After observing the condition of the home and seeing blood on the carpet, he called 911 to report his father missing. Fresno police responded to the residence shortly before 10:00 a.m.

Around 11:00 a.m., Fresno police were notified Timothy had been located. Both Allison and Timothy provided descriptions of the suspect to police. They also advised police various items were missing from their home, including several shotguns, some electronics, jewelry, and men's suits.

Timothy's gas card showed an unauthorized transaction for gas purchased at a Fresno service station on the day of the incident. His checking account showed an ATM (automated teller machine) debit withdrawal of $300 on this same date. Video surveillance from the ATM where the withdrawal occurred depicted an individual-matching the description of the suspect provided by Allison and Timothy-withdrawing money from the couple's checking account.

On October 7th, a still photograph taken from the surveillance video was sent to the media and shown on the local news. That evening, Lacandis Judge and Janay Maynard, friends of defendant's, saw a picture of the suspect on the news and thought the suspect resembled defendant. When Maynard confronted defendant, he denied culpability. He claimed he was working at a warehouse when the incident occurred, but he could not provide proof of his employment. Defendant later told Maynard and Judge he spoke with his parole agent to clear up the incident and claimed his parole officer stated the suspect had been apprehended.

On October 8th, Detective Benjamin Barnes received a phone call from Parole Agent Richard Cazares. Defendant had contacted Cazares and stated he wanted speak to him and the detectives handling the case because defendant's family members saw a photograph of the suspect on the news and remarked that defendant resembled the suspect. Barnes met with defendant and his parole officer later that day.

Defendant told Barnes he was visiting with family, and he and his family had stayed

3

at the apartment of his stepsister, Tina Collier, on the night of October 6th. Defendant stated he was at Collier's apartment all day on October 7th, and Collier would confirm his rendition of events.

On October 8th, detectives interviewed Collier. She initially told detectives defendant had slept at her house on the night of October 6th, and she saw him sleeping on her couch the following morning when she left to take her daughter to school. Collier stated she did not see defendant again until 3:30 p.m. later that day, when she saw him on the bus. When she saw defendant, he was wearing a red T-shirt and jeans.

When detectives interviewed Collier again on October 14th, she told them she was not sure whom she saw on her couch the morning of October 7th.

Video surveillance footage from the Fresno city bus showed defendant getting on the bus at a stop next to Collier's apartment at approximately 6:51 a.m. on October 7th. The video showed defendant exiting the bus at approximately 7:35 a.m. at a location two blocks away from the Casagrande home. At 11:03 a.m., additional video surveillance showed defendant entering a bus near Florence and Martin Luther King Boulevard. Defendant released Timothy in the area of Martin Luther King Boulevard and Florence Avenue around 10:45 a.m.

Defendant exited the bus in downtown Fresno at 11:17 a.m., where he boarded another bus two minutes later. Around 20 or 30 minutes later, he ended his trip near his brother's apartment in northwest Fresno. Defendant was wearing a black hooded sweatshirt and jeans in all of the video footage. The third video showed defendant wearing a red T-shirt under his sweatshirt. Fingerprints found on a bus ticket in Timothy's car were determined to be consistent with defendant's fingerprints.

Defendant was arrested on October 14th. At the time of his arrest, he had a Seiko watch in his left front pants pocket and a gold ring hanging from a gold chain around his neck. Timothy identified the watch and the ring as his. That same day, police searched Lacandis Judge's apartment and discovered a black backpack as well as mail with defendant's name on it.

During police questioning, defendant claimed he left Collier's apartment on the morning of the incident to apply a tattoo. When questioned why he was wearing the victim's ring, defendant declined to answer detectives. He claimed he had Timothy's watch because he had received it as payment for a tattoo he had done.

***Photographic Lineups***

On October 11th, Detective Barnes conducted two separate six-pack photograph lineups of potential suspects. Timothy and Allison were kept separate during the procedures. Prior to displaying any photographs, Barnes admonished each witness the photographs may or may not depict the person who committed the instant crimes, and to indicate, after looking at all the photographs, whether the person who committed the crimes could be identified.

The following facts are taken from audio recordings and transcripts of the procedures.

**Timothy Casagrande**

As Barnes laid down each photograph, Timothy made comments about the

similarities and differences between his attacker and the person depicted in each photograph. Defendant's photograph was second in the photo array.

During the procedure, Barnes asked Timothy to describe defendant's photograph. Timothy continued to comment on the photos, without responding to Barnes. Barnes asked Timothy several times whether defendant's photograph resembled Timothy's attacker more than the other photographs. Timothy did not answer Barnes. He continued to remark on the similarities and differences as to each photograph. Barnes told him to sign the back of defendant's photograph, agreeing his photograph most resembled the suspect.

**Allison Casagrande**

Barnes laid out only two of the six photographs before Allison paused. Barnes asked her whether the man depicted in the second photograph was the man she saw outside of her home on the morning of the incident. Allison replied affirmatively. Barnes laid out the remaining four photographs, describing each photograph as he did. Once all of the photographs were displayed, Allison stated the second photograph looked like the suspect. Barnes asked Allison to sign the back of defendant's photograph.

**Motion in Limine**

Defense counsel filed a motion in limine, seeking to exclude Timothy's and Allison's out-of-court identifications of defendant from the six-pack photograph array. Counsel argued the identification procedure used was unduly suggestive and the identifications were unreliable. [FN 4.] He claimed Barnes repeatedly directed the witnesses' attention to defendant's photograph by asking Allison whether defendant was the man she saw outside of her home on the day of the incident and by asking Timothy specific questions about defendant's photograph, repeatedly directing his attention to defendant's photograph.

> [FN 4.] Defense counsel also argued the admonition given pursuant to the lineup was improper, and the photographs chosen were not sufficiently neutral because they did not contain an array of people of a similar complexion, physical features, and build. On appeal, defendant concedes the admonition was, in fact, proper. He also raises no challenge to the array of photographs selected.

At the hearing on defendant's in limine motion, Barnes testified he prepared a lineup consisting of six photographs depicting individuals of the same age, who had the same skin coloring and facial features. In preparing the lineup, Barnes selected subjects based on Timothy and Allison's description of the suspect, as well as the ATM and bus video surveillance footage taken of the suspect.

When Barnes showed the photographs to Timothy, he remarked on the similarities and differences of each man in the photos compared to his memory of the attacker. When all of the photographs were displayed, Timothy picked up defendant's photograph and kept focusing on it. Defendant's photograph was the only one Barnes asked Timothy to describe because Timothy was focusing on it.

When Barnes showed the first two photographs to Allison, she became visibly upset and began to cry. She pointed at defendant's photograph, and in response Barnes asked her whether the man in the photograph was the man she saw outside her home. She responded that it was. After Barnes showed Allison the rest of the photographs, she identified defendant again.

5

The trial court denied defendant's motion, holding Barnes was reacting to the witnesses' behavior rather than emphasizing defendant's photograph. With respect to Allison, the court explained she had stopped Barnes when she saw defendant's photograph, before looking at the rest of the photographs. This behavior did not imply a suggestive lineup. With respect to Timothy, although the audio recordings alone could suggest Barnes was directing Timothy's attention to defendant's photograph, Barnes's testimony made clear he was responding to Timothy's behavior. Moreover, Timothy never identified defendant as the person who committed the crime, he merely identified defendant as the person who most resembled the suspect within the lineup.

At trial, Timothy identified defendant as the intruder, and Allison identified defendant as the man she observed outside her home.

Brooks, 2016 WL 3032035, at *1-4.

## III.   DISCUSSION

### A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.   Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405-406).

In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" <u>Cullen v. Pinholster</u>, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. <u>Davis v. Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." <u>Jeffries</u>, 114 F.3d at 1500; <u>see</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert. denied*, <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir.

2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.    Review of Petition

1.    Ineffective Assistance of Counsel

Petitioner first alleged defense counsel rendered ineffective assistance in failing to impeach the fingerprint expert with the test results. This claim was raised in Petitioner's state habeas proceedings. In the last reasoned decision, the Fresno County Superior Court denied the claim as follows:

> Petitioner presents twenty arguments in his petition for writ of habeas corpus. First, Petitioner maintains that the prosecution engaged in misconduct at trial when it allowed Vicente Guerrero to testify that Petitioner's fingerprints had been found on a bus ticket that was discovered in the victim's car despite the fact that the prosecution was aware that his testimony was false. Second, Petitioner contends that the prosecution misrepresented the evidence by claiming that Juan Sanchez had testified that the bus ticket that was issued to Petitioner in a surveillance video was the same bus ticket that was found in the victim's car. Third, Petitioner argues that the prosecution improperly shifted the burden of proof when representing that Petitioner's fingerprint had been discovered on the bus ticket that was found in the victim's car. Fourth, Petitioner contends that the prosecution improperly failed to correct Vicente Guerrero when he testified that Petitioner's fingerprints were found on the bus ticket that was discovered in the victim's car despite the fact that the prosecution possessed the results of a forensic report that showed that Petitioner's fingerprints were not on the bus ticket. Finally, to the extent that Petitioner's trial and appellate attorneys did not raise these issues, Petitioner maintains that he received ineffective assistance of counsel.
>
> . . .
>
> To the extent that Petitioner argues that the prosecution engaged in misconduct by falsely representing that his fingerprints were found on the bus ticket that was discovered in the victim's car, the Court notes that Petitioner has included the results of the forensic analysis of the bus ticket conducted by the California Department of Justice. According to that report, "[o]ne latent print developed on the FAX bus ticket [was] identified as being made by the right middle finger of [Petitioner]. A second latent print developed on the same FAX bus ticket cannot be eliminated as being made by the right index finger of [Petitioner]." (Petition, Attachment 2.) Moreover, in its decision affirming Petitioner's judgment, the Fifth District Court of Appeal

8

also noted that Petitioner's fingerprints "were consistent with fingerprints on a bus ticket found inside [the victim's] vehicle." (*People v. Renard Brooks, Jr.* (May 19, 2016, F069309) [nonpub. opn.] at p. 11.)

As one of Petitioner's fingerprints was clearly identified on the bus ticket and a second print could not be eliminated as having been made by Petitioner, the Court finds that Petitioner has failed to demonstrate that the prosecution engaged in misconduct by representing that his fingerprints had been discovered on a bus ticket or by failing to correct witnesses who made statements to that effect. (*People v. Pitts, supra*, 223 Cal.App.3d 606, 691.) For the same reason, the Court finds that Petitioner has failed to demonstrate that he received ineffective assistance of counsel when either his trial or appellate counsel failed to raise these issues. (*People v. Harris* (1993) 19 Cal.App.4th 709, 714-715; *Strickland v. Washington* (1984) 466 U.S. 668, 697; see also *In re Cox* (2003) 30 Cal.4th 974, 1019-20 [stating that a court may dispose of an prejudice without deciding if counsel's performance was deficient].) Consequently, the Court finds that Petitioner has failed to state a prima facie case for relief with respect to his first four claims.

. . .

Tenth, Petitioner contends that he received ineffective assistance of counsel when his attorney did not object to the various instances of alleged prosecutorial misconduct discussed above. Eleventh, Petitioner maintains that he received ineffective assistance of counsel when his attorney failed to object to the admission of fingerprint evidence. Twelfth, Petitioner contends that his attorney was also ineffective when he failed to object to the prosecution's purported mischaracterization of the evidence. Thirteenth, Petitioner argues that he received ineffective assistance of counsel when his attorney did not argue that the prosecution failed to keep a record of the chain of custody for the evidence that it introduced at trial. Fourteenth, Petitioner maintains that his attorney provided ineffective assistance of counsel by failing to impeach the credibility of witnesses. Fifteenth, Petitioner argues that he received ineffective assistance of counsel when his attorney failed to present mitigating evidence. Sixteenth, Petitioner argues that he received ineffective assistance of counsel when his attorney did not move for a mistrial. Seventeenth, Petitioner contends that he received ineffective assistance of counsel when his attorney did not object when the prosecution stated that the bus ticket found in the victim's car belonged to him.

However, in reviewing a claim of ineffective assistance of counsel, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington, supra*, 466 U.S. 668, 697.)

In its decision affirming Petitioner's judgment, the Fifth District Court of Appeal noted the strong amount of evidence that was presented against Petitioner at trial.

> Defendant's fingerprints were consistent with fingerprints on a bus ticket found inside Timothy's vehicle, Timothy's stolen wedding ring and watch were found on defendant's person when defendant was arrested, and a man resembling defendant was depicted on ATM surveillance video withdrawing money from Timothy's checking account on the morning of the incident. A man identified as defendant was also depicted on bus surveillance footage

9

1
2
3       traveling to a location only blocks away from the Casagrande home, just
        prior to when the incident began, and he was depicted traveling from the
        location Timothy was eventually dropped off at, shortly after the incident
        concluded. Further, Tina Collier, defendant's alibi witness, recanted her
        claim defendant was asleep on her couch when she left to take her daughter
        to school the morning of the incident.

4
5       (*People v. Renard Brooks, Jr.* (May 19, 2016, F069309) [nonpub. opn.] at p. 11.)

6       Here, Petitioner has failed to demonstrate a reasonable probability that the result of
        his criminal proceeding would have been more favorable were it not for his
7       attorney's failure to take the actions noted above. As Petitioner has failed to
        demonstrate that he was prejudiced by his attorney's purportedly deficient
8       performance, the Court finds that he has failed to state a prima facie case for habeas
        corpus relief with respect to his tenth through seventeenth claims.

9       (LD[2] 23 at 1-4, 6-8.)

10          *a. Legal Standard*

11      Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

12      Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of

13      counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466

14      U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v.

15      Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding

16      that where a defendant has been actually or constructively denied the assistance of counsel

17      altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

18      that Strickland does apply where counsel is present but ineffective).

19      To prevail, Petitioner must show two things. First, he must establish that counsel's

20      deficient performance fell below an objective standard of reasonableness under prevailing

21      professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he

22      suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

23      errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability

24      sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not

25      what counsel could have done; rather, it is whether the choices made by counsel were reasonable.

26      Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

27      With the passage of the AEDPA, habeas relief may only be granted if the state-court

28      _____
        [2] "LD" refers to the documents lodged by Respondent with the answer.

                                        10

1　decision unreasonably applied this general <u>Strickland</u> standard for ineffective assistance.

2　<u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

3　federal court believes the state court's determination under the <u>Strickland</u> standard "was incorrect

4　but whether that determination was unreasonable–a substantially higher threshold."  <u>Schriro v.</u>

5　<u>Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Knowles</u>, 556 U.S. at 123.  In effect, the AEDPA standard

6　is "doubly deferential" because it requires that it be shown not only that the state court

7　determination was erroneous, but also that it was objectively unreasonable.  <u>Yarborough v.</u>

8　<u>Gentry</u>, 540 U.S. 1, 5 (2003).  Moreover, because the <u>Strickland</u> standard is a general standard, a

9　state court has even more latitude to reasonably determine that a defendant has not satisfied that

10　standard.  <u>See Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

11　application was unreasonable requires considering the rule's specificity.  The more general the

12　rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

13　　　　*b. Analysis*

14　　　　Petitioner contends that defense counsel failed to impeach the expert witness with the

15　fingerprint test results.  He claims the expert witness's testimony contradicted the actual test

16　results.  The argument is meritless because the test results in fact showed that one of the

17　fingerprints discovered on the bus ticket was clearly identified as Petitioner's.  In his traverse,

18　Petitioner argues that the test results concluded that the fingerprint did not match those of

19　Petitioner.  (Doc. 25 at 2.)  Not so.  According to the Physical Evidence Examination Report,

20　under the "Summary/Results" heading, "[o]ne latent print developed on the FAX bus ticket [was]

21　identified as being made by the right middle finger of [Petitioner]."  (Doc. 25 at 15.)  Petitioner

22　points to the last paragraph which stated that "[n]o identifications were established as a result of

23　these searches," but that statement was in reference to whether the usable latent prints matched

24　any prints in the CAL-ID Automated Fingerprint Identification System (AFIS) and FBI-IAFIS

25　system.  (Doc. 25 at 16.)  Because Petitioner's prints and the other usable latent prints were not

26　located in the database, they were then registered in the system for future identification purposes.

27　(Doc. 25 at 16.)  Thus, the premise of Petitioner's argument is incorrect.  Defense counsel cannot

28　be faulted for failing to make a meritless argument.  <u>See Sexton v. Cozner</u>, 679 F.3d 1150, 1157

(9th Cir. 2012).

In addition, Petitioner fails to show prejudice. As discussed by the superior court, the evidence against Petitioner was strong. In addition to Petitioner's fingerprint on the bus ticket, the victim's stolen wedding ring and watch were found on Petitioner's person when he was arrested, a man resembling Petitioner was depicted on ATM surveillance video withdrawing money from the victim's checking account on the morning of the incident, and a man identified as Petitioner was depicted on bus surveillance footage traveling to a location only blocks away from the victim's home just prior to when the incident began and also traveling from the location the victim was eventually dropped off at shortly after the incident concluded. (LD 23 at 7.) Thus, a fairminded jurist could conclude that Petitioner fails to show that counsel erred, or that he suffered any prejudice from counsel's alleged failure. The claim should be rejected.

### 2. Prosecutorial Misconduct

Petitioner next contends that the prosecution committed misconduct when it "purposely allowed its witness to lie and mislead the trial court and jury." (LD 1 at 4.) He argues the expert witness lied when he stated the fingerprints on the bus ticket were his when the results contradicted his testimony. He further argues that witnesses Alison Casagrande, Timothy Casagrande, and Detective Benjamin Barnes also committed perjury, and the prosecution knowingly allowed their testimony. Petitioner restates and continues with this claim in Ground Four, labeled "New Evidence," Ground Five, labeled "False Evidence," Ground Six, labeled "Committing Perjury," and Ground Seven, labeled "Shifting the Burden of Proof." (LD 1 at 4-7.)

#### a. Legal Standard

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); Napue v. Illinois, 360 U.S. 264 (1959). So must a conviction obtained by the presentation of false evidence. See United States v. Bagley, 473 U.S. 667, 678-80 nn.8-9 (1985). In Napue, the Supreme Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to

12

go uncorrected when it appeared.  Id. at 269.  The Court explained that the principle that a State may not knowingly use false testimony to obtain a conviction - even false testimony that goes only to the credibility of the witness - is "implicit in any concept of ordered liberty."  Id.  In order to prevail on such a due process claim, "the petitioner must show that (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." United States v. Zuno–Arce, 339 F.3d 886, 889 (9th Cir. 2003), cert. denied, 540 U.S. 1208 (2004).  Nevertheless, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony.  United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995).  "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies." Id.

### b.    Fingerprint Expert

Petitioner argues that the prosecution committed misconduct by allowing fingerprint expert Vicente Guerrero to testify falsely that the latent print found on a bus ticket inside the victim's car belonged to Petitioner.  As noted by the state court, however, "one of Petitioner's fingerprints was clearly identified on the bus ticket . . . ." (LD 23 at 3.)  As previously discussed, Petitioner's argument that the fingerprint analysis concluded the fingerprint was not his is meritless.  Thus, Petitioner fails to satisfy the first prong of the test, i.e., that the testimony was false.  Therefore, the state court rejection of the claim was reasonable, and the claim should be denied.

### c.    Timothy and Allison Casagrande

Petitioner next claims that the prosecutor committed misconduct by failing to "confront" and correct Timothy and Allison Casagrande when their testimony at trial contradicted their initial statements to the police.  He raised this claim on habeas before the Fresno County Superior Court and the California Supreme Court.  In the last reasoned decision, the superior court rejected this claim as follows:

> Fifth, Petitioner contends that the prosecution allowed Allison Casagrande to testify that she had observed Petitioner twice on the day of the crimes despite the fact that her testimony was inconsistent with a statement that she had previously made to an

13

investigator with the Office of the District Attorney. Sixth, Petitioner argues that the prosecution also improperly shifted the burden of proof when it allowed Timothy Casagrande to testify that Petitioner was the perpetrator of the crimes that he had observed in his home despite the fact that this statement was inconsistent with the statement that he had provided to investigators with the District Attorney's office. Seventh, Petitioner maintains that the prosecution engaged in misconduct by failing to play an audio recording during direct examination of Timothy Casagrande's statement to investigators. Eighth, Petitioner maintains that the prosecution engaged in misconduct by allowing Allison Casagrande to falsely claim that her testimony was consistent with the statement that she had previously made to Detective Barnes.

However, a petition for writ of habeas corpus must: (1) state fully and with particularity the facts on which relief is sought, and (2) include copies of reasonably available documentary evidence supporting the claims presented in the petition. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) While Petitioner cites to the reporter's transcript of his trial court proceedings throughout his petition, he has failed to include a copy of transcripts of Timothy or Allison Casagrande's testimony that contain statements that are purportedly inconsistent with the statements that they initially gave to police. Even had he included the relevant transcripts, Petitioner concedes that audio recordings of both Timothy and Allison Casagrande's initial statements were played for the jury at trial. (Petition at [pp.] 33 & 38.) As the jury was allowed to consider both Timothy and Allison Casagrande's initial statements and the testimony that each provided at trial, Petitioner has failed to demonstrate that the prosecution engaged in "deceptive or reprehensible," tactics by either failing to correct their testimony or by not playing the audio recording of Timothy Casagrande's statement during direct examination. (*People v. Pitts, supra,* 223 Cal.App.3d 606, 691.) Consequently, the Court finds that Petitioner has failed to state a prima facie case for habeas corpus relief with respect to his fifth, sixth, seventh, or eighth claims.

(LD 23 at 4-5.)

The claim is without merit. As noted by the superior court, the jury heard the audio recordings of Timothy and Allison Casagrande's statements to the police. The jury was therefore able to consider their trial testimony along with their initial statements to police to determine their credibility. For the same reason, even if Petitioner could demonstrate that the statements were false and the prosecutor should have corrected the testimony, the failure was immaterial since the jury heard the audio recordings. Thus, the state court rejection of the claim was not unreasonable.

d.      *Detective Benjamin Barnes*

Next, Petitioner contends that the prosecutor committed misconduct when he failed to confront Detective Barnes concerning alleged perjured statements. Like the previous claims, Petitioner repeats this claim in subsequent claims. As Respondent notes, the claim is difficult to understand. From this claim as set forth in his habeas petition to the California Supreme Court, it appears that Petitioner is claiming that Detective Barnes lied when he wrote in a sworn statement

used to obtain a search warrant that Timothy Casagrande had positively identified him as the perpetrator.  (LD 32 at 37.)  Also, Petitioner asserts that Barnes lied again at the preliminary hearing when he testified that Casagrande identified Petitioner as the person who most resembled the perpetrator.  (LD 32 at 37-39.)  Petitioner states that at the hearing on the motion to suppress the evidence, Barnes was confronted with the audio recording of the identification interview and admitted that the recording was the truth.  (LD 32 at 41.)  Petitioner claims the recording proved that Barnes committed perjury, and misled and deceived the court. (LD 32 at 41.) He states that Barnes "admitted that the victim did not positively identify petitioner as the person who committed the crime" and "that the victim did not state that petitioner was the one who most resembled the perpetrator [out of] the six photographs."  (LD 32 at 41.)  Petitioner claims "the prosecutor relied on the out of court identification to boost the victim's trial testimony" and "allowed the misconduct to go on uncorrected like nothing [happened]."  (LD 32 at 55, 179, 184.)

According to the sworn affidavit he signed, Detective Barnes wrote that Timothy Casagrande "identified suspect Renard Brooks as the subject who entered his home."  (LD 1 at 207.)  In the preliminary hearing, Barnes testified as follows:

> After presenting him with all the photographs, the second photograph which contained Renard Brooks, he continued to look at that photograph and kept going back to it. Mr. Casagrande, it was difficult for him to make a real, hundred percent positive I.D. because he said the [bandana] was over [the perpetrator's] face. He [did] remember the complexion, [the] round face of the suspect, the eyes, and he just kept going back to photo number two, the second photo I showed to him and said, "Man, it looks like this guy here," most resembles the suspect of the day.
>
> . . .
>
> I asked him, "Which - - out of these photos, which one most depicts the subject you saw that day that committed the crime," and he pointed to Renard Brooks.
>
> . . .
>
> [Then] I had him sign the photograph . . . .

(LD 1 at 129-30.)

At the suppression hearing, Barnes agreed that Timothy Casagrande never verbally stated that petitioner was "the most similar to the person he saw that day." (RT 304-05.)  He testified that he "asked and requested him to sign and date the photograph that most resembles the person

who committed the crime that day other than the other five." (RT 304-05.) He denied

specifically directing him to sign [Petitioner's] photo" merely as a result of Casagrande's lack of

verbal affirmation. (RT 304-05.)

The California Court of Appeal reviewed the audio recording of the interview as well as

Barnes' testimony, as follows:

> As Barnes laid down each photograph, Timothy made comments about the similarities and differences between his attacker and the person depicted in each photograph. [Petitioner]'s photograph was second in the photo array.

> During the procedure, Barnes asked Timothy to describe [Petitioner]'s photograph. Timothy continued to comment on the photos, without responding to Barnes. Barnes asked Timothy several times whether [Petitioner]'s photograph resembled Timothy's attacker more than the other photographs. Timothy did not answer Barnes. He continued to remark on the similarities and differences as to each photograph. Barnes told him to sign the back of [Petitioner]'s photograph, agreeing his photograph most resembled the suspect.

(LD 19 at 6-7.)

The Fifth DCA then considered whether the photographic lineup was unduly suggestive:

> We initially note the audio recording of Timothy's lineup fails to resolve what occurred during the photographic lineup because it is difficult to reference which photographs he is referring to based only on his statements. From the recordings alone, it would be permissible to infer Barnes either repeatedly directed Timothy's attention to defendant's photograph, as defendant suggests, or that Barnes was asking questions about defendant's photograph in response to Timothy's behavior, as the Attorney General suggests.

> Barnes's testimony, however, supplies us with a "first person vantage." Barnes testified he asked Timothy about defendant's photograph because Timothy kept focusing on defendant's photograph. After Timothy picked up defendant's photograph, Barnes asked him whether it matched the suspect more than the other photographs. From his testimony, it is clear Barnes was responding to Timothy's behavior rather than directing Timothy's attention to or otherwise emphasizing defendant's photograph. In holding the lineup procedures used by Barnes were not unduly suggestive, the trial court credited Barnes's testimony. We defer to the trial court's determination of the credibility of witnesses (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463) and independently observe Barnes's testimony is, indeed, consistent with the audio
> recordings.

> Because we conclude the lineup procedure was not unduly suggestive, we need not reach defendant's argument that Timothy's identification of defendant was unreliable based on the totality of the circumstances. "If we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends." (*United States v. Bagley* (9th Cir.1985) 772 F.2d 482, 492.) We reject defendant's argument that Timothy's lineup procedure was unduly suggestive.

(LD 19 at 9-10.)

Petitioner's allegation of prosecutorial misconduct fails because the allegedly perjured or false statements made by Barnes to obtain the search warrant or at the preliminary hearing were not used at trial by the prosecutor. Thus, Petitioner cannot establish that the prosecutor knowingly used false or perjured evidence. Likewise, Petitioner fails to show that the false statements were material. Since they were not used at trial, they could not have had any effect on the jury's determination.

With respect to Petitioner's complaints that the statements were used to obtain a search warrant or as evidence against him at the preliminary hearing, Petitioner fails to show that the result would have been any different. Had Barnes provided a different sworn statement, there is no reason to believe a search warrant would not have been issued had Barnes described Timothy Casagrande's identification in a different manner. As well, Petitioner does not show that he would not have been held to answer for the charged offenses had Barnes provided different testimony.

For the above reasons, Petitioner fails to show that the California Supreme Court's rejection of his claim was contrary to, or an unreasonable application of, controlling Supreme Court authority.

   *e.*     *Allegations of "New" or "False" Evidence*

Petitioner further claims that certain evidence was "new" or "false" and improperly used by the prosecutor. Respondent notes that Petitioner raised similar claims in his fourth petition to the Fresno County Superior Court. (LD 28 at 25-29.) In that petition, Petitioner claimed that the latent print test results contradicted the fingerprint analyst's testimony, and that the prosecutor improperly used this evidence. This claim has already been addressed, *supra*.

Petitioner also claims that the bus ticket had a time stamp that contradicted the prosecutor's theory, and therefore the prosecutor committed misconduct by presenting false evidence when the prosecutor stated during closing argument that a witness had testified that the ticket was the same ticket Petitioner was seen on video being issued. This claim was rejected by state court because the bus ticket found in the victim's car contained Petitioner's fingerprint.

Thus, a fairminded jurist could agree with the state court rejection of Petitioner's claim.

1  The claim should be denied.

2          3.        <u>Judicial Misconduct</u>

3        In Ground Three (mislabeled as Ground Five), Petitioner alleges that the trial court judge

4  abused or misused his discretion when he denied the motion to suppress the identification.

5  Petitioner argues that Detective Barnes admitted that the victim did not identify him and that the

6  victim never told him that Petitioner most resembled the perpetrator but was referring to someone

7  other than Petitioner.  Petitioner states that the audio recording of the interview showed that the

8  victim's focus was not on Petitioner's photograph and that it was the detective who tried to get

9  him to focus on Petitioner's photo.  This claim is raised again in Ground Five, labeled "False

10  Evidence," and in Ground Eight, labeled "Unduly Suggestive Identification."

11        Petitioner raised this claim on direct appeal, and in the last reasoned decision, the Fifth

12  DCA rejected the claim as follows:

13  
14      Defendant contends the witnesses' identification of him pursuant to the
    photographic lineups were the result of unduly suggestive procedures and the
    identifications were unreliable. He alleges Barnes repeatedly directed Timothy's
15      attention to defendant's photograph, and Barnes asked Allison whether defendant
    was the suspect after she had the opportunity to view only two of the six photographs
16      in the lineup array. We conclude the lineup procedures were not unduly suggestive
    and, in any event, we find no prejudice.

17      A defendant challenging the reliability of a lineup procedure bears the burden of
    demonstrating the procedure employed was (1) unduly suggestive and unnecessary;
18      and (2) the identification was unreliable, taking into account the witness's
    opportunity to observe the criminal during the crime; the witness's degree of
19      attention; the accuracy of the witness's prior description of the criminal; the level of
    certainty demonstrated at the time of the identification, and the time between the
20      crime and the identification. (*People v. Ochoa* (1998) 19 Cal.4th 353, 412.) "'If, and
    only if, the answer to the first question is yes and the answer to the second is no, is
21      the identification constitutionally unreliable.'" (*Ibid*.) However, if the procedure is
    not impermissibly suggestive, our inquiry ends because there has been no due
22      process violation. (*Ibid*.)

23      We review de novo a trial court's ruling on whether an identification is
    constitutionally unreliable. (*People v. Kennedy* (2005) 36 Cal.4th 595, 609,
24      disapproved on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459.)
    Upon independent review of the record, we conclude the photographic lineup
25      procedures challenged here were not unduly suggestive.

26                               **Timothy**

27      We initially note the audio recording of Timothy's lineup fails to resolve what
    occurred during the photographic lineup because it is difficult to reference which
28      photographs he is referring to based only on his statements. From the recordings

alone, it would be permissible to infer Barnes either repeatedly directed Timothy's attention to defendant's photograph, as defendant suggests, or that Barnes was asking questions about defendant's photograph in response to Timothy's behavior, as the Attorney General suggests.

Barnes's testimony, however, supplies us with a "first person vantage." Barnes testified he asked Timothy about defendant's photograph because Timothy kept focusing on defendant's photograph. After Timothy picked up defendant's photograph, Barnes asked him whether it matched the suspect more than the other photographs. From his testimony, it is clear Barnes was responding to Timothy's behavior rather than directing Timothy's attention to or otherwise emphasizing defendant's photograph. In holding the lineup procedures used by Barnes were not unduly suggestive, the trial court credited Barnes's testimony. We defer to the trial court's determination of the credibility of witnesses (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1463) and independently observe Barnes's testimony is, indeed, consistent with the audio recordings.

Because we conclude the lineup procedure was not unduly suggestive, we need not reach defendant's argument that Timothy's identification of defendant was unreliable based on the totality of the circumstances. "If we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends." (*United States v. Bagley* (9th Cir. 1985) 772 F.2d 482, 492.) We reject defendant's argument that Timothy's lineup procedure was unduly suggestive.

### Allison

Barnes testified Allison began to cry after he showed her the first two photographs in the lineup. When she pointed to the second photograph, defendant's photograph, Barnes asked her, "is that him?" She responded affirmatively. Barnes proceeded to show her the rest of the photographs and once they were laid out, Allison identified defendant again.

Even without Barnes's testimony, it is readily apparent from the audio recording Allison almost immediately recognized defendant as the man she saw outside of her home on the morning of the incident, and Barnes had only responded to her reaction. Barnes's testimony bolsters this conclusion because, as he stated, Allison pointed at defendant's photograph before he finished displaying the remaining four photographs in the lineup array. There is simply no evidence Barnes used impermissibly suggestive procedures in conducting her photographic lineup.

Although we find no due process violation, we note even if we were to find the lineup procedures were unfairly conducted, defendant cannot show prejudice from the trial court's failure to exclude the witnesses' identifications. Under *Chapman v. California* (1967) 386 U.S. 18, 24, the People must prove beyond a reasonable doubt the error complained of did not contribute to the guilty verdict. "[T]he appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.'" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621.)

Even under *Chapman* review, defendant would not be entitled to reversal. Defendant's fingerprints were consistent with fingerprints on a bus ticket found inside Timothy's vehicle, Timothy's stolen wedding ring and watch were found on defendant's person when defendant was arrested, and a man resembling defendant

was depicted on ATM surveillance video withdrawing money from Timothy's checking account on the morning of the incident. A man identified as defendant was also depicted on bus surveillance footage traveling to a location only blocks away from the Casagrande home, just prior to when the incident began, and he was depicted traveling from the location Timothy was eventually dropped off at, shortly after the incident concluded. Further, Tina Collier, defendant's alibi witness, recanted her claim defendant was asleep on her couch when she left to take her daughter to school the morning of the incident.

In light of the strong evidence presented against defendant, reversal of his conviction would not be warranted even if the identifications were suggestive. Defendant has failed to meet his burden of establishing unduly suggestive lineup procedures occurred. We conclude the lineup procedures employed by Barnes were not "'''so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'''" (*People v. Brandon* (1995) 32 Cal.App.4th 1033, 1051.) We, therefore, reject defendant's claims.

(LD 19 at 8-11.)

This claim is not cognizable on federal habeas review because the admissibility of evidence is a matter of state law. Estelle, 502 U.S. at 67-68 (state evidentiary ruling cannot provide ground for federal habeas relief unless the admission of evidence violated due process). In addition, Respondent correctly argues that Petitioner cannot show that the trial court's admission of identification evidence was contrary to or an unreasonable application of Supreme Court precedent pursuant to 28 U.S.C. § 2254(d), since there is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process. In Holley v. Yarborough, the Ninth Circuit stated:

Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established Federal law," as laid out by the Supreme Court. 28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649.

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see Williams, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." Musladin, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); see Moses v. Payne, 555 F.3d 742,

760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating discretionary decisions to exclude the kind of evidence at issue here"); see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the issuance of Moses and the present, the Supreme Court has not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing] a controlling legal standard' for evaluating such conclusions. Brown, therefore, cannot – as the petitioner in Moses could not – show that the state appellate court's ruling was either contrary to or an unreasonable application of clearly established Supreme Court precedent."). Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed. Id.

Even if the Court were to consider the claim, Petitioner would not be entitled to relief. After considering the audio recordings along with Detective Barnes' testimony at the hearing, the state court reasonably determined that Barnes was not directing the witnesses to Petitioner's photograph, but was responding to the witnesses' reactions upon viewing the photographs. In any case, as previously discussed, the evidence against Petitioner in the absence of the identification evidence was strong. Therefore, Petitioner cannot demonstrate prejudice. The claim should be rejected.

### 4. False Evidence

In Claim Five, Petitioner argues that the prosecutor committed misconduct by presenting a Google map that was false, by presenting false evidence of Vicente Guerrero, and by presenting false evidence of the identification. The evidence of Vicente Guerrero and the identification were previously discussed. As to the evidence of the Google map, Respondent correctly states that it was never presented to the California Supreme Court. Therefore, he has failed to exhaust his state remedies as to this claim.

Respondent further argues that the claim is procedurally defaulted. The Court agrees. Petitioner raised the claim in a motion for evidentiary hearing in the Fresno County Superior Court in his fourth habeas action. In that motion, Petitioner argued that the prosecution

knowingly presented false evidence when she entered into evidence and submitted to the jury a Google Map that incorrectly placed a bus stop at a certain location to corroborate Allison Casagrande's testimony. (LD 28 at 34.) He claimed that further discovery would show that the bus stop was knowingly placed at the wrong location. (LD 28 at 34.)

The superior court rejected the claim on procedural grounds, stating: "To the extent that Petitioner is attempting to support his current arguments with additional facts or evidence, the Court finds that Petitioner has failed to present an adequate explanation for his failure to present the additional support for his claims in his prior petitions for writ of habeas corpus." (Lod. Doc. 29 at 2.) Citing to In re Clark, 5 Cal.4th 750, 767 (1993), the court denied the claims as successive. (Lod. Doc. 29 at 2.)

State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes, 433 U.S. 72, 86–87 (1977). In turn, federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements . . . ."). This concept has been commonly referred to as the procedural default doctrine. This doctrine of procedural default is based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32. If the court finds an independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park, 202 F.3d at 1150.

The mere occurrence, however, of a procedural default will not necessarily bar a federal court from reviewing claims in a petition for writ of habeas corpus. For the procedural default doctrine to apply and thereby bar federal review, the state court determination of default must be

grounded in state law that is both adequate to support the judgment and independent of federal law.  Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30.  Put another way, the procedural default doctrine will apply only if the application of the state procedural rule provides "an adequate and independent state law basis" on which the state court can deny relief.  Park, 202 F.3d at 1151 (quoting Coleman, 501 U.S. at 729-30).

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law."  LaCrosse, 244 F.3d at 704 (citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with federal law.'" (quoting Coleman, 501 U.S. at 735).  "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'"  Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma, 470 U.S. 68, 75 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and consistently applied.  Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court.") (quoting Ford v. Georgia, 498 U.S. 411, 424 (1991)).  Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.'"  Id. at 377 (quoting Morales, 85 F.3d at 1392).

The superior court's rejection of this claim as successive under In re Clark constituted an adequate and independent state ground barring federal review.  See In re Robbins, 18 Cal.4th 770, 788 n. 9, 811 (1998).  Petitioner fails to demonstrate cause and prejudice, or that a fundamental miscarriage of justice would occur if the claim were not considered.  Therefore, federal review is barred.  Coleman v. Thompson, 501 U.S. 722, 749-50 (1991).

Notwithstanding the failure to exhaust and procedural default, the claim is meritless.  He merely asserts that the map was inaccurate.  Without any factual support, the claim is entirely

conclusory. Moreover, he fails to show that the prosecutor knew the map was inaccurate, and therefore he cannot establish prosecutorial misconduct under Napue. Finally, even if he could show that the map was false, he fails to demonstrate any reasonable likelihood that it could have affected the judgment of the jury. Hayes v. Brown, 399 F.3d 972, 984 (9th Cir. 2005). The evidence against Petitioner was substantial and included fingerprint proof, eyewitness identification, and Petitioner's possession of the victim's stolen goods. For the foregoing reasons, the claim should be denied.

## IV.     RECOMMENDATION

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).

///

///

///

///

The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __November 15, 2018__             _____/s/ Jennifer L. Thurston_____

1          UNITED STATES MAGISTRATE JUDGE
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28